IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| SUZETTE M. PENNAMON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. 5:11-CV-153(MTT) |
| ) | |
| RICHARD H. BISHOFF, ) | |
| d/b/a RICHARD H. BISHOFF, P.C. ) | |
| ) | |
| Defendant. ) | |
| ) | |

## ORDER

This matter is before the Court on Defendant Richard H. Bishoff d/b/a Richard H. Bishoff, P.C.'s Motion for Summary Judgment. (Doc. 24). For the following reasons, the Motion is **GRANTED**.

## I.  FACTUAL BACKGROUND

This is an action for disparate treatment and retaliation[1] on the basis of race by Plaintiff Suzette Pennamon pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*, and 42 U.S.C. § 1981.[2]  For reasons not entirely clear, the Plaintiff did not sue her actual employer, Richard H. Bishoff, P.C.  Rather, she sued Richard H. Bishoff d/b/a Richard H. Bishoff, P.C.[3]  This confusion regarding the identify

---

[1] The Plaintiff is no longer pursuing a hostile work environment claim.  (Doc. 39, at 14).

[2] Neither Party briefed the Plaintiff's section 1981 claim, but the analysis is the same as Title VII. *Chapter 7 Trustee v. Gate Gourmet, Inc.*, __ F.3d __, 2012 WL 2072671 (11th Cir.).

[3] The Plaintiff's EEOC charge of discrimination identified the employer as "Richard H. Bishoff Attorney at Law."  Perhaps the Plaintiff was concerned that her failure to identify the professional corporation in her EEOC claim would bar her civil suit.

of parties is made more confusing by the fact that the "Defendant" disputes that Richard H. Bishoff, P.C. employs 15 or more employees, the threshold for Title VII coverage. Although the Plaintiff makes a halfhearted argument that she has sued the professional corporation, that clearly is not the case. She has sued Richard H. Bishoff individually, whom she contends does business as Richard H. Bishoff, P.C. The Plaintiff's argument, at this point, is that she has sued Richard H. Bishoff individually, but as the managing agent of Richard H. Bishoff, P.C. For the most part, this Order will simply refer to the "Defendant," without specifying precisely who the Defendant is.

The Defendant assists clients in making claims against the Asbestos Personal Injury Settlement Trust in Delaware. The Defendant has offices in Thomaston, Georgia and Augusta, Georgia.

The Plaintiff, a black female, began working in the Defendant's Thomaston office as a medical assistant in April 2008, although she was not put on the Defendant's payroll until November 2008. As a medical assistant, the Plaintiff checked clients' vital signs, such as blood pressure, temperature, and weight. The Plaintiff also performed some clerical duties, such as answering phones and handling intake forms.

The Plaintiff received $8.50/hr for clerical work and $9.50/hr for medical assistant work. According to Richard H. Bishoff, when Julie Owens, a white female, was hired as a medical assistant, she agreed to a flat $9.00/hr rate, but was paid $9.50/hr by mistake. (Doc. 27, Deposition of Richard H. Bishoff, at 10-11). The Plaintiff eventually discovered that Owens was paid more than her. According to the Plaintiff, when Owens reported this disparity to Kimberly Phillips, the office manager and Richard H. Bishoff's stepdaughter, Phillips said "Oh, s***." Owens does not recall having a conversation with

Phillips about the pay differential or hearing Phillips utter an expletive in response. In any event, Phillips informed her stepfather, who said "[b]y all means correct that." (Doc. 27, Deposition of Richard H. Bishoff, at 11). The Plaintiff's pay was increased to a flat $9.50/hr rate, and she was retroactively paid for the two weeks that Owens was paid more than her. The Plaintiff believes this pay differential was not a mistake because two white medical assistants in the Augusta office also made more. The Defendant contends the medical assistants in the Augusta office made more because they were the only employees in the office, and thus had more responsibilities.

The Plaintiff also claims she was discriminated against because she was the only one who had to "fight for overtime that was owed." (Doc. 26, Deposition of Suzette Pennamon, at 147). According to the Defendant, those two or three occasions were due to an error in the payroll service that handles overtime. The Defendant corrected this matter, and the Plaintiff does not contend there is any overtime work for which she has not been compensated.

The Plaintiff also believes she was subject to racial discrimination because Phillips threw a paystub at her. Owens, who was present, claims the paystub was not thrown, but instead dropped or tossed on a desk. (Doc. 28, Deposition of Julie Owens, at 14).

On another occasion, the Plaintiff claims Ashley Bishoff, Bishoff's stepgranddaughter and Phillips' daughter, blocked an office walkway, which required the Plaintiff to maneuver around Ashley. Ashley then placed her hands on her hip and looked up and down at the Plaintiff. Ashley claims the Plaintiff told her to meet outside

so she could whip Ashley's "skinny white a**." (Doc. 34, Deposition of Ashley Bishoff, at 14). The Plaintiff denies making this statement.

The Plaintiff also had conflicts with Ashley's sister Meghan because Meghan did not like the Plaintiff sitting at her desk. The Plaintiff claims Meghan was terminated because she was "prejudiced." (Doc. 26, Deposition of Suzette Pennamon, at 140-41). Meghan and her stepgrandfather claim she was terminated because she did not take the job seriously, i.e., she ate on the job and perused social-networking sites while working.

When the Delaware Trust stopped paying claims, Bishoff sent a letter to all employees on October 15, 2009, that read:

> Effective December 1, 2009, there will be a major layoff of employees in this [office] as we begin the shut down process. This memo is intended to provide six (6) weeks advance notice in the event you wish to seek other employment prior to layoff. For any employee needing a letter of recommendation please feel free to contact me and I will gladly provide letters to any prospective employers. Those who are unable to find other employment will be terminated for lack of work.
>
> As indicated at the time of hiring this project would eventually come to a conclusion and we are now reaching that point. I appreciate your hard work and devotion and have enjoyed working with each of you.

(Doc. 26-1, at 10). The Plaintiff signed the letter acknowledging that she had read it. *Id*. Seven employees (five white, two black) who worked on asbestos claims were laid off. Karen Pena, a Hispanic woman who attended court reporting school and worked for the Defendant part-time, was retained because, according to Bishoff, she was a "computer whiz." (Doc. 27, Deposition of Richard H. Bishoff, at 14).

After the layoff, the Plaintiff enrolled in nursing school full-time and worked part-time at the Georgia Department of Labor. When the Plaintiff learned that the Defendant

was starting back up,[4] she called Phillips on January 7, 2010, who informed the Plaintiff that the Defendant only was hiring people who could work full-time. The Plaintiff protested and said Bishoff promised to give laid off employees "first choice at coming back." (Doc. 26, Deposition of Suzette Pennamon, at 117). The Plaintiff then wrote a letter dated January 12, 2010, to Bishoff that read, in part: "I recently received information concerning the re-opening of your office for Asbestos related clients. Due to the fact that I was employed for over 1 year at your office I wanted to inquire about your intensions (sic) on whether or not I would be rehired." (Doc. 26-1, at 15). Bishoff replied two days later:

> Thank you for your recent inquiry concerning job openings. I am currently interviewing to fill a full time clerical position. If you or someone you know is interested, please contact me.
>
> Until we are up and running and I can determine our volume of new clients, I do not know how many doctors or medical assistants I will need to hire.

(Doc. 26-1, at 16). The Plaintiff did not contact Bishoff after she received the letter.

In addition to the Plaintiff, neither Ashley nor the Plaintiff's sister was rehired. Phillips called Owens in December 2009 to ask her to come back to the job, and she accepted.

The Plaintiff filed a charge of discrimination against "Richard H. Bishoff Attorney at Law" with the EEOC on May 10, 2010. After the charge was filed, Bishoff found out that employee Tracy Montgomery and the Plaintiff remained in contact. Consequently, Bishoff cursed out Montgomery, and Montgomery resigned on May 21, 2010. (Doc. 36, Deposition of Tracy Montgomery, at 15-18). Montgomery worked over 40 hours a week

---

[4] It seems the Delaware Trust had a certain amount it could pay out per year. That explains why operations would have resumed around January.

for the Defendant and drove a school bus part-time. (Doc. 36, Deposition of Tracy Montgomery at 67-68). Although Montgomery and the Plaintiff were friends, they had a brief falling out after Montgomery said one of the children on her bus route smelled like a "pulpwood n*****." (Doc. 36, Deposition of Tracy Montgomery at 18, 23-24). The Plaintiff eventually told Bishoff what Montgomery said, and Bishoff made Montgomery give a recorded statement about what happened.

The Plaintiff filed this action on April 20, 2011. "The gravamen of Plaintiff's complaint is not that she was treated unfairly in Defendant's lay offs, but that his failure to call her back as he *promised* while rehiring Julie Owens and allowing Karen Pena to work and go to school were discriminatory." (Doc. 39, at 10) (emphasis added).

The Defendants moved for summary judgment on all claims. The Defendant asserts the Plaintiff was not rehired because she did not apply and because he wanted to hire individuals who could work full-time.

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment must be granted if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material facts and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "A factual dispute is genuine only if 'a reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)). The burden rests with the moving party to prove that no genuine issue of material fact exists. *Info. Sys. & Networks Corp. v. City of*

*Atlanta*, 281 F.3d at 1224.  The district court must "view all evidence in the light most favorable to the nonmoving party, and resolve all reasonable doubts about the facts in its favor."  *Id.*

### B.     Applicability of Title VII to the Defendant[5]

The Parties dispute whether Richard H. Bishoff can be subject to Title VII liability and whether the employer meets the Title VII threshold.  Pursuant to Title VII, "[t]he term 'employer' means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person...."  42 U.S.C. § 2000e(b).  Title VII expressly includes individuals and unincorporated organizations in the definition of "person."  42 U.S.C. § 2000e(a).  "As the EEOC's standard reflects, an employer is the person, or group of persons, who owns and manages the enterprise."  *Clackamas Gastroenterology Associates, P.C. v. Wells*, 538 U.S. 440, 450 (2003).

Here, the Plaintifff argues Richard H. Bishoff is sued as the managing agent of Richard H. Bishoff, P.C.  Pursuant to section 2000e(b) and *Clackamas*, this allegation is sufficient to subject Richard H. Bishoff to Title VII liability.  With regard to number of employees, a genuine issue of material fact exists whether Richard H. Bishoff, P.C. had 15 or more employees.  Because Richard H. Bishoff may be sued as the managing agent of the professional corporation and the Court cannot determine as a matter of law

---

[5] Section 1981 "does not set a limit on the minimum number of employees required to state a claim for employment discrimination."  *Thomas v. Meister Heating & Air Conditioning, Inc.*, 98 Fed. Appx. 508, 510 n.1 (7th Cir. 2004).

that the Plaintiff has failed to satisfy her burden of establishing 15 or more employees, the Court must proceed to the merits.[6]

### C.   Disparate Treatment

The Plaintiff, like most plaintiffs, relies on the *McDonnell Douglas* framework to establish her case through circumstantial evidence.  "In a traditional failure-to-hire case, the plaintiff establishes a prima facie case by demonstrating that: (1) she was a member of a protected class; (2) *she applied* and was qualified for a position for which the employer was accepting applications; (3) despite her qualifications, she was not hired; and (4) the position remained open or was filled by another person outside of her protected class."  *EEOC v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1273 (11th Cir. 2002) (emphasis added).  If the plaintiff establishes a prima facie case of discrimination, the burden of production, but not the burden of persuasion, shifts to the employer to articulate some legitimate, nondiscriminatory reason.  *Id*. at 1272.  "Should the employer meet its burden of production, the presumption of discrimination is rebutted, and the inquiry 'proceeds to a new level of specificity,' in which the plaintiff must show that the proffered reason really is a pretext for unlawful discrimination."  *Id*. at 1272-73.  "Title VII does not require the employer's needs and expectations to be objectively reasonable; it simply prohibits the employer from discriminating on the basis of membership in a protected class.  We do not sit as a super-personnel department, and it is not our role to second-guess the wisdom of an employer's business decisions – indeed the wisdom of them is irrelevant – as long as those decisions were not made with a discriminatory motive.  That is true no matter how medieval a firm's practices, no matter how high-

---

[6] The Court need not address whether the Defendant's joint venture agreement with a Hattiesburg, Mississippi law firm counts toward the 15-employee threshold.

handed its decisional process, no matter how mistaken the firm's managers." *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266-67 (11th Cir. 2010) (internal quotation marks and citations omitted).

Because every individual has a race, the Plaintiff automatically satisfies the first element. The Plaintiff also satisfies the third element because she was not rehired. With regard to the fourth element, the Plaintiff claims the medical assistant position was filled by Owens. The Plaintiff does not provide any evidence whether the clerical position was filled. Even if the clerical position was left open or filled by a non-black individual, the Plaintiff cannot satisfy the second element because she did not apply. In fact, Bishoff expressly invited the Plaintiff to apply for the position. The Plaintiff assumed she would not have been hired for the position because she could only work part-time. She also did not apply for a medical assistant position, and, in any event, Owens already had been selected when the Plaintiff inquired about the position. Although the Plaintiff argues that Bishoff promised to rehire her after the layoff,[7] the Plaintiff did not include a breach of contract claim in the Amended Complaint.

Even if the Plaintiff could establish her prima facie case, the Defendant clearly has articulated a legitimate, nondiscriminatory reason for not rehiring the Plaintiff. As the Plaintiff has acknowledged, the Defendant only wanted to hire those who could work full-time. Consistent with the Defendant's plan to hire only those who could work full-time, one employee who was in school full-time dropped out so she could come back to work. (Doc. 34, Deposition of Ashley Bishoff, at 28); (Doc. 27, Deposition of Richard Bishoff, at 33). The Plaintiff attempts to rebut this reason by arguing that Pena was

---

[7] Actually, the Plaintiff quotes Bishoff as saying he "he would *try* to rehire [laid off employees] after the lay-off." (Doc. 40, Plaintiff's Statement of Material Facts, at ¶ 31) (emphasis added).

allowed to work part-time, but Pena remained employed throughout the layoff.  The Plaintiff also points to the Defendant's decision to allow Montgomery to keep her part-time job as a school bus driver, but she admits that Montgomery worked full-time for the Defendant when she returned from the layoff.  (Doc. 40, Plaintiff's Statement of Material Facts, at ¶¶ 28, 34, 50).  Thus, the Plaintiff has not shown that this legitimate, nondiscriminatory reason is pretextual.

In sum, the Plaintiff can neither establish a prima facie case nor rebut the Defendant's legitimate, nondiscriminatory reason.

The Court acknowledges that "establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case."  *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).  "Rather, the plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent.… A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker."  *Id.* (internal quotation marks and citations omitted).

Here, the circumstantial evidence does not give rise to an inference of discrimination.  The strongest pieces of circumstantial evidence are issues related to pay in the Thomaston office, but nothing in those incidents hint of racial discrimination.  Moreover, both were corrected by the Defendant.  Additionally, there is almost no circumstantial value to Phillips saying "Oh, s***" when the Plaintiff discovered she was

paid less than Owens, a disparity that was promptly corrected.  The phrase is, at best, equivocal – it could mean "I cannot believe she found out we are racist" or "I cannot believe I did such a stupid thing."  No inference of racial discrimination arises from the fact that the two white medical assistants in the Augusta office initially were paid more than the Plaintiff.

The Plaintiff claims she and her sister were the only black employees in the office and were the only two employees who were not rehired.  That is not the case; Ashley was not called back either.  (Doc. 34, Deposition of Ashley Bishoff, at 7).  Further, the Plaintiff admits that her sister's employment "was only for on an as needed basis, and her time was up … [s]o she wouldn't have been rehired."  (Doc. 26, Deposition of Suzette Pennamon, at 54).

The Plaintiff also takes issue with Bishoff's decision to allow Pena, the "computer whiz," to work part-time, arguing this is evidence of a pro-white work environment.  Specifically, the Plaintiff repeatedly refers to Pena, who is of Mexican descent, as a "White Hispanic" because that is how she is classified by the United States Census Bureau.  The Plaintiff's point may be technically correct, but misses the mark in practice.  Indeed, both Pena[8] and the Plaintiff[9] consider Pena to be of the "Mexican" race.  In fact,

---

[8] Q: Let me ask you: Tell me what your race is.
A: I'm Mexican.
Q: Okay.  And I guess, forgive me, but do you consider yourself to be White Hispanic, how do you self identify?
A: I'm White Hispanic.
Q: White Hispanic?
A: Yes, sir.
Q: And, you know, has that always the way you self identified?
A: I guess not.  I've never really been asked if I was a White Hispanic.  I've just always said Hispanic.
(Doc. 38, Deposition of Karen Pena, at 6-7).

[9] Q: Ms. Pena, by the way, is she white?

because many Hispanics do not consider themselves to be white, the current criteria will be reevaluated before the 2020 Census.  Tim Padgett, *Still Black or White: Why the Census Misreads Hispanics*, TIME, Mar. 29, 2010, *available at* http://www.time.com/time/nation/article/0,8599,1975883,00.html.  That being said, the Court does not infer discrimination against blacks because of a white employer's decision to retain a Hispanic woman with exceptional computer skills part-time.

Further, no inference of racial discrimination can be gleaned from Bishoff's harsh words with Montgomery once he heard that she remained in contact with the Plaintiff.  The Plaintiff already had filed a charge of discrimination against the Defendant and Montgomery's mouth already had proven to be a liability for the Defendant.

The Plaintiff believes racial discrimination can be inferred from Phillips throwing a paystub at her.  The Plaintiff also believes she was discriminated against on the basis of race because Ashley allegedly blocked her path in a walkway and placed her hands on her hip and looked up and down at the Plaintiff.  Significantly, the Plaintiff cites Ashley's "cattiness tended to happen here" quote[10] in which Ashley explained that the workplace

---

A: She's Mexican.
Q: Do you consider her white?
A. Mexican.
Q: I don't know.  Is that white in your opinion?
A. No.
Q: She's Hispanic?
A. Yes.
Q: That's different, I guess, from white and black in your opinion; is that right?
A. Yeah.
(Doc. 26, Deposition of Suzette Pennamon, at 100-01).

[10] Q   And would those confrontations have been between white employees?
 A   Sure, I mean. I mean it has not been racially. It wasn't just between a white employee and a black employee or a black employee and a Hispanic. It was - We are all females and, you know, sometimes cattiness tended to happen here.
(Doc. 34, Deposition of Ashley Bishoff, at 18).

drama had nothing to do with race, but rather too many women in one office. (Doc. 40, Plaintiff's Statement of Material Facts, at ¶ 15). The Court takes no position on the cause of any drama or discord in the Defendant's office other than to conclude that a jury could not infer racial discrimination from the foregoing incidents.[11]

Accordingly, because the Plaintiff has not presented circumstantial evidence of racial discrimination through the *McDonnell Douglas* framework or otherwise raised an inference of discrimination, the Motion must be granted on the Plaintiff's disparate treatment claim.

### D. Retaliation

The *McDonnell Douglas* burden-shifting framework also applies in retaliation cases. To establish a prima facie case of retaliation, a plaintiff must show that: "(1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment action; and (3) he established a causal link between the protected activity and the adverse employment action." *Brown v. Alabama Dept. of Transp.*, 597 F.3d 1160, 1181 (11th Cir. 2010) (internal quotation marks and citations omitted). With regard to the first element, the employee must "at the very least, communicate her belief that discrimination is occurring to the employer, and cannot rely on the employer to infer that discrimination has occurred." *Demers v. Adams Homes of Northwest Fla., Inc.*, 321 Fed. Appx. 847, 852 (11th Cir. 2009) (internal quotation marks and citations omitted).[12] With regard to the third element, "the temporal relationship between the protected activity and the adverse employment action must be 'very close.' Even a three-month

---

[11] The cattiness in the Defendant's office is reminiscent of the exchanges between counsel during depositions.

[12] Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir. R. 36-2.

interval between the protected expression and the employment action … is too long." *Brown*, 597 F.3d at 1182 (internal quotation marks and citations omitted).

Here, the Plaintiff claims she engaged in statutorily-protected activity by complaining about not being paid overtime and about receiving less than Owens. Although the Plaintiff believes these incidents were racially motivated, there is no evidence the Plaintiff communicated her belief to the Defendant that racial discrimination was occurring. Assuming her grievances could constitute statutorily-protected activity, the Plaintiff then runs into a problem with the causal connection element. Owens testified that she was hired in October 2008. Owens claimed the Plaintiff discovered the pay disparity when the Plaintiff helped her with her first payroll two weeks later, which would have been in October/November 2008. This one-year gap clearly is insufficient to establish a causal connection. However, the Plaintiff claims, implausibly, that she discovered Owens was being paid more on October 1, 2009, and she used that date on her charge of discrimination. But even assuming the appropriate date is October 1, 2009, the Plaintiff still runs into a causal connection issue because she did not inquire about being rehired until January 7, 2010, more than three months later.

Further, even if the Plaintiff could establish a prima facie case of discrimination, the Defendant argues it was only hiring individuals who could work full-time, and as stated in the section above, the Plaintiff cannot rebut this legitimate, nondiscriminatory reason.

Accordingly, because the Plaintiff cannot establish a prima facie case of retaliation and has failed to demonstrate that the Defendant's legitimate,

-14-

nondiscriminatory reason was pretextual, the Motion is granted on the Plaintiff's retaliation claim.[13]

### III.  CONCLUSION

For the foregoing reasons, the Motion is **GRANTED**.

SO ORDERED, this 24th day of July, 2012.

S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT

---

[13] Apart from the *McDonnell Douglas* framework, the Plaintiff does not argue that she has otherwise presented circumstantial evidence that would allow a jury to infer retaliation. The Court need not decide whether an inference of retaliation is coextensive with the *McDonnell Douglas* framework. A plaintiff must, at a minimum, present some evidence that he or she communicated his or her belief that unlawful discrimination was occurring. As stated above, the Plaintiff did not communicate her belief that racial discrimination was occurring, and thus a jury could not infer that the Defendant retaliated against her.